United States Court OF APPEALS

FOR THE TENTH CIRCUIT

RECEIVED
U.S. COURT OF APPEALS
10TH CIRCUIT
2024 OCT -4 AM 9:42

Tony Tremayne Lewis,
  Plainhff-Appellant

v.

Jeff Zmuda, a/k/a Jeffery Zmuda, et al,
  Defendants - Appellees

No. 24-3098
(D.C No 5:23-cv-03236-JWL
  (D. Kan)

RESPONSE TO Order Denying/Denying Motion requesting counsel

Before **Holmes**, Chief Judge

September 26. 2024

First and foremost I want to point out a statment which seems like a seed to bias conduct-to-come: In the order issued by this court, the Judge states: "Appellant, who is proceeding without the assistance of counsel in this appeal, has filed a motion asking [this court] to appoint an attorney for representation [at public expense]." I must state for the record, that what followed was "The motion is denied," but more importantly, the fact that appointed appeallant counsel comes at "public expense" shouldnt matter, when one considers the merit of my alledgations filed in the case above.

The penal system **is ran off of the public's expense**, yet [their money] isnt abating the unconshtuhonal behavior of prison staff; and for that reason, I am filing this "reconsiderahon for counsel to be appointed."

I must state. I do not understand this court's perspective on why appointed counsel for this matter shouldnt be "considered", considering the details I've already expressed to the court, and considering the fact that you have **access to all which has been argued-and-denied**, and, most importantly · presented (as in exculpatory evidence)

I am not an experienced attorney; Im not even a prisoner who has a degree in paralegal realms, so why and how does [this court] expect me to produce the briefs and argument efficiently, and effectively?

I do not have the knowledge on composing acceptable briefs for this court's view, for consideration, nor do I know how to enhance the arguments which I've already presented to this court, when I submitted my entry of apperance.

But, for the sake for avoiding another miscarriage of Justice, like in Jolivet v. Deland. 966 F.2d 573 [I have attached all of the documented arguments necessary] to show [this court] that [there were many] acts of "intolerable and shocking" conduct, which must be considered "continuing mistreatment of a constitutional stature" See Johnson v. State. 289 Kan. 642, 648, 215 P.3d 575 (2009)

Appointed counsel [is] necessary, to review my case file and apply his or her knowledge in a way tha' benefit this court through a perfectly composed brief, and of coarse a very persuasive oral argum.

1.

To dissent to that, would be a tacit regret to allow counsel for Heather Spurlock, in this court's previous case in 2016; and that sort of "tacit regret," would be such a sham toward my 6th amendment rights under the United States Constitution. How can you not concur?

Im entitled to Equal Protection of law, and it would be [a violation of that 14th amendment right] if [this court] once again, reviews the information attached and decieded that appointed-counsel for this matter isnt required, or necessary.

With regard to the arguments I submitted in connection to the District Court's abuse of discretion, pertaining to [that court's] denial of appointing counsel on multiple occassions, [this court] must not neglect the importance of Abdullah v. Gunter. 949 F.2d 1032, ¶ and the benefits counsel could provide in expressing that case's significance at creating much reason to reverse and remand.

In closing and final elucidation = in connection to the arguments attached. counsel in this matter [must be appointed] to help me combat (through this appeal) the erroneous denials of such merit, and, established laws, which tried to use as "motivating authorities."

Submitted for Decision,

*Tony Lew*

Appellant. Tony Tremayne Lewis

# IN THE DISTRICT COURT OF UNITED STATES
## FOR THE DISTRICT OF KANSAS

Tony Tremayne Lewis #98308
    Plaintiff

v.

The Kansas Department of Corrections
     Respondents.

)
)
)
)
)
)
)

CASE number: 5:23-CV-3236-JWL

## MOTION TO SUBMIT "Supplemental Reasons for Civil Counsel"

 The Plaintiff, Tony Tremayne Lewis #98308, comes with needs to ask this court to entertain and consider additional reasons the Plaintiff <u>must</u> be granted effective civil rights counsel. According to standards established within Pruitt v. Monte, 503 F.3d 647, 659 (7th CIR 2007) this Court needs to consider (additionally) the following arguments, which are in connection with Plaintiff's most recently submitted **Motion** (requesting reconsideration for Appointment of Civil Rights Counsel.)

 In Nelson v. Redfield Lithograph Printing, 728 F.2d 1003 (8th CIR 1984) A Chief Judge set forth "the standards" by which the district courts are to determine the need for appointed counsel for indigent civil litigants :

 The Plaintiff wants to direct this Court's focus and concern to (two) particular standards -
1.) The Plaintiff's ability to investigate the facts, and 2.) The indigent's ability to present the case

 <u>· The Indigent's ability to present the case</u>

 "In determining whether an indigent litigant is in need of appointed counsel a number of factors are relevant including: the factual complexity of the case, the ability of the indigent to investigate the facts, the existence of conflicting testimony, the ability of the indigent to present his claim and the complexit of the legal issues." (quoted from) Abdullah v. Gunter, 949 F.2d 1032

1.

In October of 2023 the Plaintiff (prison inmate) brought a civil rights action under 42 U.S.C.S § 1983 against a stew of state officials whom hold or held employment for the (Kansas) Department of Corrections.

The Plaintiff initially told this court, this 1983 civil action addressed the numerous occassions - throughout 2021-2023-where the Plaintiff's constitutional rights (as an inmate) were spitefully violated.

• Motion for Appointed Civil Rights Counsel was requested; However, this court found no reasons to grant Pro Se Plaintiff effective counsel... and denied such request two times.
Since those denials-for requested Counsel, the Court abused its discretion by dismissing 5 out of the 6 issues which attempted to address claims of severe constitutional violations. As a Pro Se litigant, the Plaintiff submitted documentation and written dissent, in effort to combat the court's dismissals... however, such "requests for reconsideration" were to no avail, for the Plaintiff.

Since these actions have occured (the Plaintiff) has been harassed and forced to endure more acts of cruel and unusual punishments. And upon information and belief, these recent torts against this ProSe prisoner was committed as a way to retaliate against Mr. Lewis 98308, for apparently utilizing his governed right to petition to the courts (and or) government.

With respect to the additional torts committed by KDOC since the filing of civil complaint herein, the Plaintiff used his right as a Pro Se prisoner to file another amended complaint so he could add-in, and address, the supplementary issues of constitutional violations.

Despite the merit of those additional claims, the Court refused to accept his amended complaint - and did so in such an odd manner - for the Plaintiff did indeed file the 2nd amended complaint using the correct XE 8/82 forms, provided by the United States District Court.

The Plaintiff is going to resubmit that 2nd amended 1983 complaint, when he files [this] reconsideration and Plea for Civil Rights Counsel. And that reason (alone) will be enough to

prove to a higher court that the appointment of Civil Rights Counsel is required; the decisions within cases such as: Donald v. Cook County Sheriff's Dep't, 95 F.3d 548, 556 (7th Cir 1996), and Bowser v. Montana 2007 WL 1456012, will support the facts-of-the "judicial voids" in question now.

[the court] in Donald, made it clear that ("The Court may assist the Plaintiff by providing counsel for the limited purpose of amending the complaint.")

This Court, after now learning the wisdom above-which is in the two cited ordeals like Bowser v. Montana - must set-aside any and all irrelevent feelings and agree that [the Plaintiff's efforts at reaching proper rectification through his Section 1983 filing does - by "the standards" of law - require immediate appointment of counsel.]

However, if this court again fails to grant "counsel-appointing"... for the reason of [being able] to properly and effectively present supplemental torts, there are other mitigating circumstances which exsist, and should be heavy enough evidence to push shift this court's toxic-perspective toward appointing pro se prisoners effective Civil Rights Counsel.

· THE DISREGARDS TOWARD THE ENTITLEMENTS OF PRO SE Prisoners

It should be no secret secret - a Pro Se Prisoner becomes gifted with certain "entitlements" the average inmate doesn't have. One of those entitlements is the guarantee that prison officials must cough over paperwork from the prisoner's files in a reasonably prompt time frame. Records will show that KDOC fails to respect [that] entitlement, and does so with obvious intent to derail the Plaintiff's Section 1983 complaint.

As a Pro Se litigant, the Plaintiff attempts to gather facts pertaining to his ordeals, and he does this by having to gather all documentations that support the facts being used to address the alledged constitutional deprivations at hand. Most of the time in similar situations those type of documents are simply recorded-requests and recorded conversation through the

Department of Correction's electric (and) regular Inmate Request Form system.
The system's purpose is to give prisoners a reliable, but protected, way of communicating
things such as simple request and moreso valid concerns to some KDOC official whose
job title and duties handles ~~the~~ said matter ~~withand~~ that within that particular eletric (and) regular
Form-9.

For the sake of understanding, the term "Form-9" is a second name for Kansas Dep't of
Correction's Inmate Request Forms.

With regard to the Plaintiff's civil litigation, here, and the alledged times he claimed prison staff
violated his rights - There were many times the Plaintiff had to use the prison system's Form 9
system to discuss the matters he is suing about.

According to the rules and regulations of the Kansas Dep't of Correction, when a prison official
receives an Inmate Request Form from a prisoner, that prison official then has a duty (official duty)
to not only reply but to reply within the "10-business day policy". That policy ensures that all Form 9
submissions _receive a response_ and that it arrives no more later than 10 business days from
date the Form9 was handed in.

The Plaintiff will show-through exculpatory exhibits - there are alot of times when KDOC
staff disregard the policies of our discussion, now and even sometime goes further with their
misconduct-by choosing _not to provide any response_ ... even to very important messages,
that addresses **really important** concerns.

Exculpatory exhibits, within this motion, will become proof for this court that ~~there were~~
Inmate Request Forms (of the Plaintiff's), which were maliciously ignored; and the appointment
of civil rights counsel is now seriously required because, some of the Plaintiff's ignored
Form 9s was moments when Plaintiff was either: reporting some new adverse action done to him
by staff; requesting to receive some type of (preservation of evidence) in connection to the
adverse actions committed; or, was sending staff a written warning, that Plaintiff would
sue _if_ no KDOC official provided relief at the Administration-level, for the suffering KDOC
staff had subjected him to.

(4.)

See Exhibit 5-2- which is a recorded attempt of Plaintiff reporting another form of retaliation to his Unit team Manager who so happens to be an active participant in the yearly neglect and abuse the Plaintiff has filed civil suit about.

Exhibit 3-2 has a dual purpose. For the sake of this court's comprehension of how the dire need of appointed counsel is really now necessary.

Exhibit 5-2 shall show that the Plaintiff is enduring atypical and significant hardships, ~~are~~ through forms of retaliating for filing grievances, and of course-for filing this 1983 Section. The Exhibit for the Plaintiff ~~will~~ also show that certain KDOC-employees are continuing to give his valid concerns^and warnings unconstitutional type of disregards.

Seriously, one must ask themselves at this moment a self-checking question -

When it comes to the importance of being able to effectively investigate, as a Pro Se prisoner...
(From a legal place), How much abundance came towards the Plaintiff's capability, in "effectively" litigating as a Pro Se Prisoner?... after such a repeative notice and warning goes ignored?

But most importantly, How can this court learn of such a disregard, toward a Pro Se prisoner's lack of safety, by the hands of (prison officials)... and then claim that the pro se prisoner has a more than fair chance at winning big, without a lawyer?

The message within Exhibit 5-2 was sent off on May 26, 2024, and it did successfully make it to Defendent Jeremy Hoepner's electric-inbox. The GTL messaging system for the electric-form 9's, gave Hoepner fair-notice a response to the matter was due on, or by June 9th, 2024. When June 9th arrived, the pro se prisoner hadnt received anything of a response. And even days after, no prison official came to [me]or wrote to[ma] informing the serious matter was given to the Secretary of Corrections like I had requested.

These type of disregards are nothing less from 'dangerous', and this is why Plaintiff needs alot of help from an effective law firm, who specials in defending prisoners injured or badly effected by constitutional deprivations.

(5.)

Appointed civil rights counsel is now required, by the duty of any Judge presiding over such a litigation. See Hendricks v. Coughlin, 114 F.3d 390, 394 (2d Cir 1997)

Due to the acts of retaliation the Plaintiff is showing a crippling ability was created and the only correct cure must be the appointment of Counsel.

See Exculpatory Exhibit S-3

The matter the Plaintiff addresses in Exhibit S-3 was a clear-cut constitutional violation, which was done with retaliatory intent, by a prison official who was suppose to have been listed in the complaint as also a Defendant, being sued in his individual capacity; however, because of the callous type of care the matter and request was given, the Plaintiff was hindered at obtaining the exculpatory-confirmations which was/is required to successfully show a court, that the constitutional deprivation occured.

The prison official (Unit team Henke) clearly violated the Plaintiff's "protected rights" under not only the 8th Amendment, but also the First and 14th amendments as well, when he failed to see that (someone) view the security film and in addition, then provide the Plaintiff the supporting evidence he needed to properly present a claim to a civil court.

The Plaintiff wants to hold certain prison officials civilally liable for their wanton participation, in regard to the unlawful conduct of Exhibit S-3, and it would effectively benefit this Plaintiff (and the court) if appointed counsel was given so that attorney could investigate, then utilize their resources to assist the Plaintiff in not only amending the complaint, but most importantly assist in successfully stating an undisputable claim that warrants the sort of monetary damage award (Punitive) this type of civil complaint deserves. Moreover, being able to effectively show a Defendant's "state of mind" during the omission of their poor choices is a much-needed element when it comes to establishing good reasons, for why a very large Punitive damage award is needed as proper rectification. See Swofford v. Mandrell, 969 F. 2d 547, 552 (7th Cir 1992)

(6.)

(Exhibit S-4) is a message the Plaintiff sent to the Deputy Warden over "security," and it shows good ~~persuasive~~ and persuasive reason for the need of <u>immediate</u> appointment of Civil Rights Counsel.

The attached documentation tells, the message to Deputy Warden Moore, requesting permission to use money out of a "forced" savings account was forwarded from the Plaintiff on May 30th, 2024.

This Court must know, that during the time of May 30th, 2024, the Plaintiff not only had less than $3.00 in his available spending account, but he also was being confronted with motions-opposing his 1983 Section complaint.

As a Pro Se litigant, the Plaintiff had an obligation to submit "responses" to the Defendants Martinez Report, and formulate combative-arguments in defense to the court's ill-view that the Plaintiff's civil suit warranted a dismissal.

The Plaintiff had more **funds** stored in his forced account than he did in his regular account, and it was necessary for the Plaintiff to seek "special permission" so he could use [his money] to purchase a particular book which aims at (helping prisoners learn how to effectively litigate a Section 1983 complaint, as a Pro Se inmate)

The message to [Deputy Warden Moore] was never replied to, however, another Deputy Warden gave the denial after the Plaintiff submitted the AWR with special request, for the permission to be able to" use "restricted funds" to buy very important "legal material"; in connection to a pending lawsuit. And it is because that book was legal material, that there's reason now for an immediate appointment of Civil Rights Counsel.

SEE Exhibit S-5 The Account Withdrawal Request (AWR) Form 1504a that was used to attempt the purchase of "Pro Se 1983 Section Manual"

With effective counsel assisting this Plaintiff's efforts, that lawyer could properly point out crucial facts for the courts; crucial facts like-the **AWR** clearly showing that a prisoner's "forced savings" <u>can</u> be used to satisfy book buys — but only when the book is non-fiction

(7.)

and pertains to "civil filing." It cannot be disputed, an inmate's 1983 Section complaint is (technically) simply a (civil filing) situation which caters mostly to incarcerated-litigants. Upon information and belief, the Deputy Warden who denied the AWR dated 5-30-24, had some knowledge of the Plaintiff's effort at successfully sueing (her employer) KDOC, but had more than enough knowledge, and sense, to know that such a denial contradicted the same regulation, that was used as reason for the AWR denial.

Appointed counsel, could effectively argue the theory which that could prove Deputy Warden BOS most likely did act with the intent to retaliate; that she wanted to get back at the Plaintiff for having nerve to impliment her into tear his current "civil-filing" situation [Tony T. Lewis v. Kansas Department of Corrections..]

Such a legal theory would be too complex, for a person not diplamaned once graduated with legal degrees, to attempt to convey to a jury... and I mean, effectively convey.

This 1983 civil litigation, consist of a slew of consolidated issues which addresses repeated acts of constitutional violations, that has spanned over a duration of two years.

KDOC staff is aware of this civil complaint's existence, yet for some dangerous reason there still are individuals of the prison who disregard the risks and continue, or participate in not only unconstitutionally mistreating the Plaintiff, but go beyond the discreet to hinder the Plaintiff from one day convincing this court to consider all these new mitigating circumstances, and decide to appoint this Plaintiff the effective counsel he truly needs.

Because, the appointment of effective civil rights counsel is something this Plaintiff is now entitled to. Please, during this third request, the Plaintiff respectively demands that he is awarded an effective attorney through an order to appoint."

The Plaintiff declares, that this information has been true, and submitted with good faith. ~~good faith.~~

Cordially Submitted.
Pro Se Prisoner - Tony T Lewis, 98308
Tony T Lewis

# Arguments
## and
## Authorities

Issue #1: Plaintiff's stolen $900.00 check
and failure to redress

Contrary to ignorant beliefs and opinions, incarcerated citizens still are protected by certain rights of United States Constitution. And if ever those rights are trampled upon, by prison staff or a government official, a 1983 Bivens action is always the correct course of remedy.

In September of 2021, the Plaintiff utilized his First Amendment right by petitioning to Riley County Court a challenge to redress an illegal garnishment he was subjected to in 2019. See Exhibit A (Motion to Void Restitution Due to Incarceration and Refund)

Central Inmate Banking officials were responsible for directing the plaintiff's money to the proper destination — Riley County's court clerk; however, the facts show that is not what occured. See Exhibit B (Mr. Henke's disposition of investigative facts).

The facts show that the plaintiff's $900 check was unlawfully mailed to a place called The Kansas Payment Center. And what makes the action so unconstitutional is it was done in secret, and in opposition of the Due Process Clause.

The Due Process Clauses prohibits governments, including prison officials, from depriving inmates of life, liberty, or property without due process of law.

According to the 14th Amendment, money is property, and a liberty interest, and like other property, it is protected by the Due Process Clauses and the Takings clause of the United States Constitution.

At no time are prison officials, nor any local agency allowed to simply take money out of a prisoner's account without notice or a hearing.

At no time, or date, did the Kansas Payment Center issue a lawful notice to garnish the Plaintiff; and neither did Central Inmate Bank.

The Plaintiff made it clearly known that a fraction of that $900 check was to satisfy the cost of filing his litigation in Riley County; yet Central Inmate Bank disregarded that information, and sent his money elsewhere, while knowing it would enable the Plaintiff to appear unable to properly file his complaint. And because of their actions, the plaintiff's rights governed by the First Amendment was also violated.

CIVIL RIGHTS COMPLAINT § 1983

See Lewis v. Casey 518 US 343, 350, 135 L.Ed 2d 606, 116 S.Ct 2174 (1996) citing Bounds v. Smith, 430 US 817 52 L.Ed 2d 72, 97 S.Ct 1491 (1977): "Prisoners clearly have a Constitutionally protected right of access to the courts."

See also, Ryland v. Shapiro, 708 F.2d 967 972 (5th Cir 1983): "Interference with a prisoner's right to access to the courts, such as a delay may result in a constitutional deprivation."

The facts will show, as a result of Central Inmate Banking's misconduct the Plaintiff was forced to cough over an additional check of $195.00, and wait over a year just to get his petition filed, while all the while, Central Inmate Bank continued to deceive the Plaintiff into thinking his original check for $900.00, was sent and cashed by the proper place. — Riley County Courthouse.

• More Constitutional violations arose as Plaintiff asked for Redress

The Kansas Department of Corrections are in cohoots with the Kansas Bureau of Investigation. (KBI)

The meaning of 'cohoots (herein) does not mainly hold negative meaning — it simply means to be connected with.

The Kansas Bureau of Investigations enlist agents to the Kansas Department of Corrections, and these agents work out of its' facilities, in a department named EAI.

EAI stands for 'Enforcement Apprehension and Investigation, Enforcement, Apprehension, and Investigation

It is undisputable that all officers/agents employed by EAI are law enforcement officers, whom all hold means and capabilities to investigate crimes committed against prisoners.

When the Plaintiff's $900.00 check was improperly handled, and forwarded to the Kansas Payment Center, a crime of Theft was committed.

See K.S.A 21-5801, where the definition of crime is clearly established.

Theft is any of the following acts done with intent to permanently deprive the owner of the possession, use or benefit of the owner's property or services:

(1) Obtaining or exerting unauthorized control over property or services

(2) obtaining control over property or services, by deception

The moment Central Inmate Bank unlawfully exerted control over the Plaintiff's money, the Plaintiff became a victim of a crime.

CIVIL RIGHTS COMPLAINT § 1983

# IN THE United States District Court
## FOR THE DISTRICT OF KANSAS

Tony Tremayne Lewis
      Plaintiff

v.

Jeff Zmuda, et al
      Defendants

## RESPONSE TO ORDER TO SHOW CAUSE and DISMISSAL

Comes now the Plaintiff Tony T. Lewis responding with truth and merit, and shall argue in the form he was revoked, of any hope of relief.

Count I - Issue of $900.⁰⁰ check to Riley County Courthouse **stolen** then fraudulently cashed.

The Plaintiff told this Court this issue violated the Due Process Clause and the Plaintiff's First Amendment rights; specifically speaking his right to access to Courts.

This District Court deemed the Plaintiff's complaint worthy of dismissal, cause he hadn't "stated any claim" thats constitutional.

The Plaintiff strongly and adamently disagrees.

Lets retrace the facts:

In September of 2021 the Plaintiff attempted to file a civil claim in Riley County's District Court.

The claim was against KDOC staff and a Trustee out of Junction City Kansas.

The Plaintiff submitted an AWR for $900.00, requesting that the funds go to the Clerk of the Riley County Courthouse, to help him file a non frivilious case in [their] Court.

See Exhibit I   That request was approved by the Warden of Lansing Correctional Facility, and the next step in the process was the 900.00 check being mailed out to Riley County Courthouse; yet, instead of the Plaintiff's money going to Riley County Court it went someplace else... *without authorization.*

A Defendant by the name Jessica Ramsdell, was the person who held responsibility for that check's arrival at Riley County Courthouse.

Per policy, every time an inmate's money gets transformed into a check, that **check** must always be directed to the person or **organization** company which is indicated on the check's 'Payable To.'

The Plaintiff clearly requested he wanted the $900.00 to go to Riley County **Courthouse** and the staff seemed well aware of where the money was going and what its' intentions were.

**See Exhibit I** According to Central Inmate Bank the only place [that $900.00] was approved *allowed* to go to was Riley County Courthouse.

In March of 2022 the Plaintiff received a letter from the clerk of Riley District Court informing him that his small claims petition could not be properly filed, due to his funds never arriving to satisfy the costs of filing fees, and etc. **See Exhibit VIII**

The Plaintiff's legal case was returned, and he had to spend another $195.00 to make sure his claim against KDOC officials was filed. **SEE Exhibit II** and Exhibit ____

The Plaintiff contacted Central Inmate Bank, and asked where was the $900.00 check, because Riley County hadn't received it; [they] told him the check was cashed on October 1, 2021 by the clerk of Riley County Court. See Exhibit A12

For close to a year Central Inmate Bank deceived the Plaintiff to think nothing wrong happened with the check — that it was mailed to Riley County Courthouse, while all the while knowing the check was withheld then mailed to a payment center, for some restitution the Plaintiff wasn't obligated to pay yet.

After it became obvious the KDOC staff tampered with his mail and stole his money, the Plaintiff reached out to the facility's EAI unit requesting help for filing charges.

EAI, first stalled, then they denied to help file any charges. Defendant Sissell is the person who gave a denial personally. See Exhibit III and Exhibit ____

The Plaintiff took administrative measures and filed both an argumentive property claim, and a facility Grievance.

Both attempts at administrative relief were denied by prison officials (now Defendants herein)

The issue at law is whether or not any constitutional violation occured. So lets begin to speak about how the defendants violated first the Plaintiff's right to Due Process.

A Due Process violation occured the moment Central Inmate Bank redirected the Plaintiff's 900.00 check without proper authority.

There was no Court Order to intercept that 900.00$ check-intended for Riley County Courthouse.

In Sandin v. Conner, it states: "To establish a due process claim, the plaintiff must show that he was deprived of a protected liberty interest, and that the deprivation occured without sufficient due process protections."

Not only does the Plaintiff have a ~~requested~~ protected liberty Interest, but he also has a protected "property" interest; and both were trampled upon the moment the defendants mailed this check to a destination it wasn't approved to go to. See Exhibit VIII [That action] is an action which broke state laws and even a federal.

First and Foremost this Court needs to be aware that any garnishment to the Plaintiff would be a violation to ( if the Plaintiff was incarcerated) State v. Alcala, and also State v. Alderson 299 Kan. 148, 151, 322 p3d 364 (2014)

In Alderson, that Court held that "restitution not due while prisoner incarcerated unless district court declares contrary intent on record." 301 Kan at 840.

The Plaintiff uses Alderson because the Defendant leans on "restitutions" as their reason for rerouting the Plaintiff's check, so the CPC could steal it. The CPC is the Centralized Payment Center.

At no time of the year of 2021, did the Plaintiff receive any order from any Court stating he was to be garnished immediately; and because so, the defendant's actions produced a claim which is ~~constitutional~~ unconstitutional.

Proper notification was required, before the Plaintiff's money was seized, then arbitrarily forwarded to the payment center in question.

Because there was no court order to intercept that $900.00 check, a major Due Process violation occured; and the Defendant Jessica Ramsdell is mainly responsible.

3.

The Plaintiff has a protected property interest, governed under the 14th Amendment of the US Constitution; that means no government, person or company can illegally deprive him of any amount of [his] money, ~~without~~

Because the Plaintiff's check was seized without legal cause, that seizure was a lash toward the Plaintiff's rights under the 14th, the 8th, and the 1st Amendments to the Constitution.

According to the law - a prisoner's money is always ~~that~~ a prisoner's property.

Due to the facts stated, this court should not continue to be blind to the obvious constitutional violation which occured, and should move this issue for a jury ~~trial~~ trial so the Plaintiff can obtain justice.


## 2. Access to the courts

It is well-established that a prison inmate has a constitutional right of access to the courts.

The Plaintiff comes now demonstrating that the alleged acts or shortcomings of defendants "hindered his efforts to pursue" a non-frivolous legal claim. Lewis v. Casey, 518 US 343, 349 (1996)

See Exhibit VIII - On March 23, 2022 the Clerk of the District Court sent back the Plaintiff's motion, and told him his motion couldnt get filed cause they hadnt received the money for the filing fee.

[The money] she was referring to, was the check for $900.00, the Plaintiff tried to mail them approx 6 months prior. (Sep 2021)
And it was then-at that moment- that the Plaintiff's right of access to the courts was indeed violated.

## See Simkins v. Bruce 406 F.3d 1239

The United States Court of Appeals for the Tenth Circuit, held that : " States are required to provide affirmative assistance in the preparation of legal papers in cases involving constitutional rights and other civil rights actions related to their incarceration, but in all other types of civil actions, states may not erect barriers that impede the right of access of incarcerated persons."

The Defendants "erected barriers" by seizing [his] money (for Riley County Courthouse) and sending it to a place the Plaintiff had no requested obligations to. That course of action is not mere negligence; rather, it is intentional conduct violating plaintiff's right of access to the courts. See also Henriksen v. Bentley, 644 F.2d 852, 854 (10th Cir) : " actions which prevent an individual from communicating with a court could constitute denial of access to the court, and thereby violate a recognized constitutional right." Without the filing fee, a case cannot be heard by a Judge.

It has been made clear, a constitutional claim has properly been brought to this court's attention, and any dissent leading to dismissal shall be a sham against Simkins v. Bruce

4.

## 3. Defendant Sissell

Plaintiff asserts liability against Defendant Brett Sissell on the grounds that he refused to investigate the allegation of money being stolen from the Plaintiff's banking account.

It is well established that due to Sissell's occupation as an agent-of-law enforcement, he had a duty of law to help the Plaintiff file an official police report and assist in gaining some remedy to the potential crimes committed against the Plaintiff.

This district court stated that the "Plaintiff's allegations fail to demonstrate the objective component of an Eighth Amendment claim". Furthermore, the Plaintiff (according to this court) failed to state a claim against Defendant Sissell in Count I.

Apparently, the Plaintiff disagrees.

See Exhibit A17    Central Inmate Bank gave Centralized Payment Center possession of 900$ check.

Issue of law : How does the mishandling of the $900 check amount to a substantial risk of serious harm?

The $900.00 check in question became **stolen**, not merely "lost". And when it was stolen, [that act] created a clear substantial risk of serious harm.

See Exhibit X : It is undisputable, that check number "132841" was only authorized to go to Riley County Court. The money, belonged to the Plaintiff and it was processed and handled by a staff member of Central Inmate Bank. And it is also undisputable, staff members employed by the Kansas Department of Corrections used communization crime as a way to impede the Plaintiff's efforts to pursue a legal claim.

See KSA § 21-5801

"Theft" is a crime in the state of Kansas

Because this court can not rightfully declare **no Theft was** committed, Special Agent **Sissell** (Defendant) had an official duty to investigate once the Plaintiff explained what had occured.

The Plaintiff can testify that on the day he spoke to EAI, while living in E Unit at El Dorado Correctional Facility, Agent Brett Sissell showed no concern after hearing what happened, and wouldnt suggest reporting the issues up to his Supervising Agent — whomever that would've been. According to the Plaintiff, when Sissell denied to help his reason for not helping was — "They didnt get into things like that.'" "They"-being **EAI** or **KDOC**; and the "things" he was referring to, were situations that involve **crimes happening to inmates** by **gaurds, and other staff**.

Agent Sissell's response was not only an error, but it was also constitutionally flawed.

See the scrutiny in cases, such as: **Alexander v. Perrill**, 916 F.2d 1392, 1395 (9th Cir 1990)

When it comes to prison officials who learn of harm coming and does nothing about it, the court in Perrill made it clear that prison officials cant learn of harms done and not atleast do something/anything to prevent harm from continuing or happening at all.

With regard to what happened to the Plaintiff's check, if Sissell's professional conduct was a ship it has sunk down into a Sea of Deliberate Indifference.

Deliberate indifference exists when an official "knows of **and** disregards an excessive **risk** to inmate health or safety." Wilson v. Seiter, 501 U.S. 294, 299 (1991)

The Plaintiff believes he has now presented a viable claim against Defendant Sissell, for violating the Plaintiffs right under the 8th Amendment, by refuses to serve and protect and alert authorities concerning the check.

This court must keep in mind the fact that this check for $900 was not only stole, but it was fraudulently cashed.

The Centralized Payment Center could not legally cash a check which wasnt made out to [them]; yet they somehow made that possible. For some many reasons Agent Sissell should've asked more questions in regard to the check, and the crimes which _were_ committed.

But he did not do so. And as a result, here we are.

The Plaintiff believes he has done his part to convince this Court that this matter deserves a jury trial, so the Defendants can be held accountable for their violations to the Constitution.

## 4. Defendants Williams, Zmuda, and Holthaus

Plaintiff asserts liability against Defendants Williams, Zmuda, and Holthaus on the grounds that they **maliciously** denied his grievance and property claim related to the $900 check.

The same facts that are in those facility claims are in this 1983 Bivens complaint.

**Each one** of the Defendants stated herein, was made aware the Plaintiffs check for 900 was wrongfully seized, stolen... **then cashed fraudulently.** Tampering with mail shouldn't be tolerable.

The evidence that was presented with those facility claims was **too exculpatory** to simply ignore. See Exhibit **A3**

The things which Unitteam Henke found out, were very damaging to the Kansas Department of Corrections, Central Inmate Bank, and the **CPC**. Yet, the Plaintiff's facility grievance was denied. And so was the same for his property claim. SEE Exhibits **A** , **A14**

Moreover, there were also so many careless **denials**. By looking at the evidence this court will see that the Plaintiff's claim and grievance weren't properly considered.

The Kansas Department of Corrections failed to provide the Plaintiffs a required Grievance serial number.

It was the Defendant Tommy Williams duty to carefully screen the Plaintiff's facility grievance; yet it shows very little care was provided. SEE Exhibit A5

The **Warden Tommy Williams** abandoned his duty to make sure the Plaintiff's grievance received a proper serial number. And that lack of serial number could've had some weight on why the Plaintiffs appeal to the grievance was also denied.

Despite the missing serial number, the Secretary of Corrections should've made the right decision, by granting the Plaintiff administrative relief; yet he denied it, and did so on unestablished grounds.
See Exhibit A

The Defendants declared that the Plaintiff received documentation from the courts regarding the 900$ check before the money was confiscated and sent to Geary county; yet there is no evidence of a Court Order exsisting.

7

If a prisoner submits a grievance, that grievance should never be denied because of reasons other than a lack of merit. When prison officials erroneously deny relief, at the administrative level, those choices often lead to consequences, that are in the form of 1983 Bivens suits.

See Searles v. Van Bebber, 251 F. 3d 869

In this case, the courts held that the Wardens should always approve grievances when those grievances state actual acts of constitutional mistreatment.

Basically speaking - if relief is deserved... relief needs to be given. In this case, "relief" equals "remedy".

Due to the facts of the $900 check ordeal, the Plaintiff told the Warden, and the Secertary of Corrections that he wanted to be compensated, and in a specific manner. See Exhibit A11

It was true, KDOC owed the Plaintiff 900.00 for sending the $900 check to the wrong place. Check 132841 was only approved to go to Riley County Courthouse. Yet directly from Lansing Correctional Facility, the check 132841 was sent to some type of Payment Center. See Exhibit ___

prison officials denied the Plaintiff's request for compensation because they claimed (despite all the opposing evidence) that Central Inmate Banking in Lansing, did mail the check 132841 to Riley County Courthouse. They went even further with their denial by claiming it was Riley Courthouse who sent CPC the Plaintiff's $900 check.

Because that was not accurate... The Plaintiff was entitled to receive the remedy he asked for.

And the evidence within these exhibits should give much concurrence

The indemnification the Plaintiff seeked wasn't uncommon, nor was it unclear. SEE Exhibit A11

The Plaintiff specifically expressed to the Warden and Defendant Zmuda that he deserved swift compensation, in the amount of $900.00.

For stealing his money to Riley County Courthouse, the Plaintiff requested this specific remedy: 1. "15 Television 2. Panasonic or Sangean desk radio; 3. Clip-on lamp w/working bulb; 4. $100 worth of Union Supply package items; 5. $150.00 worth of "regular" canteen item 6. "18 Fan 7. Size 12 1/2 Nike Crosstrainers, and finally $45.00 deposited onto his available spending account. The Plaintiff wanted that form of compensation, but the Defendants decided not to grant his request. Futhermore, ignoring the Plaintiff's fair warning of civil filing.

SEE Exhibit A13

8.

Apparently the Plaintiff's correspondence to the Secretary of Corrections dated March 15, 2023 fell on deaf ears, because he was told that no compensation, in regard to his $900, was going to happen, for the matter was "now a civil matter."

See Exhibit A16

For the reasons stated herein the Plaintiff is entitled to move this claim to a jury trial so he can properly demand a judgement of relief. It was clear, the Plaintiff's funds for Riley County Court was illegally withheld and then re-routed; making the decisions by the Defendants unconstitutionally wrong.

# Count 2 - Denial of outside publications

The Plaintiff alleged violations of his right to freedom of speech under the First Amendment and his rights to Equal Protection under the Fourteenth Amendment, because prison officials unlawfully prohibited him from receiving any reading material from outside publications or vendors.

This court did not agree that the Plaintiff should be given any remedy.

Apparently, the Plaintiff disagrees.

The Plaintiff uses the case Beard v. Banks again, despite the Judge's misunderstanding judgement, because it actually is the case which should win this Plaintiff a ruling for remedy.

See Beard v. Banks, 548 U.S. 521 (2006)

The reason this portion of the claims exist is because the Kansas Department of Corrections implemented a rule that prohibited inmates (housed only in segregation) from ordering or receiving any reading material.

The Plaintiff is not a prisoner with a law degree, yet immediately he submitted formal notices to prison officials informing them that what they were allowing was against the law of the Land. See Exhibit B

The prison officials in El Dorado Correctional Facility were allowing "Central Office" to continue doing something which was unlawful — and that was prohibit inmates from learning.

The Kansas Department of Corrections amended their policy IMPP 12-120A, disallowing inmates in Restrictive Housing Units from ordering or receiving any reading materials from outside bookstores and vendors.

A Pennsylvania prisoner sued, for being subjected to a similar policy, however the High Courts in that state held the policy was constitutional.

That Supreme Court's decision was damaging to Banks, however this court should agree it does assist this Plaintiff, and his arguement.

9.

First and Foremost the Plaintiff needs to point out that him and Banks are not the same type of prisoner.

The Supreme Court decided that policy was justifiable for a certain classified group of inmates.

In Beard v. Banks the prisoner was classified as one of the worst-of worst type of prisoner.

The prisoners in Pennsylvania have "Restricted Housing Units", just as well as KDOC does; however, KDOC does not operate any "LTSU".

Pennsylvania houses its 40 most dangerous and "recalcitrant" inmates in a special unit called the Long Term Segregation Unit. In that unit, inmates begin in level 2, which has the most severe restrictions, but may graduate to the less restrictive level 1.

Banks, was a level 2 inmate when he filed his 1983 Bivens action.

Pennsylvania's Department of Corrections has 3 special units used for "segregation"; the LTSU is the most restrictive of the three units, which houses the most difficult prisoners.

The other units, are the "Restricted Housing Unit" (RHU) and the "Special Management Unit" (SMU).

Despite the reasons inmates are placed in those units, the "LTSU" is the only unit fit to be prohibited against like they was (are). And because that is true the Plaintiff has a valid argument about why Beard v. Banks shows how KDOC is in contravention to the Constitution, by applying such a ban to its inmates in segregation. without legal cause.

But even Banks' was allowed legal material, despite that court decision. The definition of "legal material" should always consider books about the law... legally speaking - 'Battling The Administration' was a book about the law.

To assist the Plaintiff's effort at filing a proper 1983 Bivens action, he ordered a book titled 'Battling The Administration'. See Exhibit **B1** The Plaintiff was housed in El Dorado's Correctional Facility Restrictive Housing Unit, when he made that purchase.

When the book arrived, it was seized, due to it being banned according to IMPP 12-120A. The Plaintiff didn't get any sense from EDCF, so he petitioned to the Defendants Jeff Zmuda and **Darcie Holthaus**, stating prohibitions to his right to receive reading material shouldn't be tolerated. SEE Exhibit **B2**

As usual, the Defendants above denied the Plaintiff administrative relief; one without good reason while the other was denied for no reason shown.

10.

## Poets and Writers magazine :

In addition to the seized publication titled Battling the Administration, KDOC also banned the Plaintiff's remaining subscriptions of a magazine called Poets and Writers.

The Plaintiff had paid to receive approx 12 subscriptions (issues) over two years. The Plaintiff subscribed to Poets and Writers magazine in 2022, and had several more issues to receive during the time IMPP 12-120A was "amended" and placed into effect.

The Plaintiff was indeed in segregation when he was receiving his magazines. See Exhibit ____

And according to Prison Records he had never used his Poets and Writers magazine in any way which became a danger to others, yet, he was forced to go without any new issues, after April of 2023.

Since the date IMPP 12-120A was amended, the Plaintiff had received two notices telling him he couldn't receive the latest issue mailed to his facility. SEE Exhibits **B6**, **B7**

Not only was these magazine bans in violation of the Plaintiff's 1st Amendment right, but a major violation of his liberty interest exsisted as well.

The Plaintiff could not receive any money back from the damages the policy had created.

[Each] issue of Poets and Writers cost 6.99; and the Plaintiff lost out on two issues, then another two months after. See Exhibit **B8**

Thats approx $ 21.00 c the KDOC denied from the Plaintiff illegally.

This court must be advised that prison officials failed to properly seize/censor the Plaintiff's incoming issues to Poets and Writers. See Exhibits B8, B7, B6

For each seizure of Poets and Writers EDCF used a Request/Authorization to Remove Personal Property. The correct method, was to seize the publication using a 16-102 form. Exhibit **B9**

Without a 16-102 form the prisoner is not able to appeal the decision to seize or censor to the Secretary of Corrections.

According to law deprivations that arise from policy violations shall never be allowed.

See Pell v. Procunier 417 US 817 (1974) : "Failure to adhere to federal law, your state's administrative regulation's and your agency policies and procedures is evidence of malicious intent to violate our rights."

Because of these stated facts, the Plaintiff deserves redress for the unlawful deprivations toward his education, tools for rehabilitation, and his money.

The ban of these publications, is in contravention to other policies the Department of Corrections have set.

See Kansas Department of Corrections' General Orders 15-103 : Offender Personal Property

" Offender shall be permitted to retain, purchase and receive hygiene and/or personal property items in accordance with IMPP 12-120

According to IMPP 12-120 A, inmates shall be permitted to own "legal material".

Their definition of "legal material" states: "material concerning a pending or anticipated case, wherein the resident is or may be a party, and includes pleadings, transcripts, books, notes, drafts, and correspondence to and from attorneys, courts, and public officials."

With great regard to the "book" Battling The Administration, it was a greater error on KDOC to seize that from the Plaintiff, especially knowing he had pending cases against prison officials (the administration)

See Exhibit B10 prison officials even refused to place the seized legal book in the Plaintiff's "seg non-allowable box", and give it to him after he went back to general population.

The Plaintiff's behavior had not been as bad as Banks' behavior in Pennsylvania, so he wouldn't have been subjected to the questionable policy in Beard v. Banks.

For the reasons stated in Beard v. Banks, the IMPP 12-120 A in Kansas is not constitutional.

A jury trial for this issue is required, not a summary dismissal

12.

## Count 3 · Denial of use of tablet

The Plaintiff alleged he was unconstitutionally denied the use of a tablet for two months without due process. He also asserts that the unconstitutional denial also deprived him access to his money which was on the tablet account.

According to law, money is property and like other property it is protected by the Due Process Clauses and the Takings Clause of the Constitution.

It cannot be argued, a hearing and finding of guilt was required before the Defendant Brian Buchholz suspended the Plaintiff's tablet privilige; especially considering his living conditions during that time. See Brown v. District of Columbia, 66 F. Supp 2d 41, 45 (D. DC 1999) "Plaintiff was simply not afforded the most basic process - an opportunity to know the basis on which a decision will be made and to present his views on that issue or issues."

Upon transferring from Lansing Correctional Facility the Plaintiff was dubiously placed in a MRA cell, which had no cabinets, no desk, and no telephone; nor did it have any working outlets for electronics.

The Plaintiff was not on MRA status while at LCF.

During October of 2022 a tablet was recovered broken in the trash. An officer working the unit confronted the Plaintiff about the broken tablet, but the Plaintiff assured he did not break the tablet.

Noone can say they witnessed the Plaintiff break any tablet, yet on October 10th 2022 the Plaintiff was told his tablet priviliges were suspended, for allegedlly destroying a tablet. See Exhibit C

When tablets are broken out of frolic or mischievousness, the culprits always receive disciplinary reports or atleast an order to pay restitution. The Plaintiff received neither.

When the Defendant Buchholz unlawfully suspended his account, the Plaintiff had approx $606.00 on his tablet account.

And it is more the deprivation of the money which is unconstitutional, than it is simply the privilige of using the tablet.

The Plaintiff's tablet account was unlawfully suspended for approx. 60 days, before someone saw the need to uplift the deprivation. The Plaintiff seeked administrative relief through a property claim (CAO 707545)

13.

He sought compensation of 4,500.$, but the property claim was erroneously denied.
See Exhibit C3, C4

That denial was upheld by The Kansas Secertary of Corrections on May 11, 2023

Due to the merit of that property claim, the Plaintiff filed suit against the Defendants.
See Exhibit C6

When there is evidence of a compensable injury caused by a violation of the plaintiff's rights,
compensation must be rewarded.

"Compensable injuries include loss of liberty (money) and injuries to the quality of an individual's life –
like disgusting conditions, or deprivation of privileges

See Nolley v. County of Erie, 802 F. Supp 898, 907-08

In that case the Plaintiff was awarded $125 a day, for the prison officials misconduct.

The Defendant's gross misconduct about in this case shows need for the relief the Plaintiff has
requested.

Tony Tremayne Lewis
            Plaintiff

v.

   Kansas Dept. of Corrections
             Defendant

case no: 23-3236-JWL

## Motion to file 2nd Supplemental Claims

    The Plaintiff comes now requesting that this Court accept his additional claims.
Attached with this motion is the required paperwork (another Amended 1983 complaint)

    The Plaintiff wants to introduce into his already existed complaint 3 additional incidents involving several violations of the Plaintiff's constitutional rights.

    Most of the defendants the Plaintiff comes now discussing were previously dismissed in this court's most recent judgement order, however, due to the facts and evidence presented herein, the Plaintiff believes this court should reinstate those Defendants and hold each one under their respected liability.

    The Plaintiff has only amended his 1983 complaint once and when he did the Defendants weren't given any service order yet. The reason the Plaintiff could not impliment the claims herein (then) was because the Plaintiff couldnt provided some necessary documentations in order to show good cause why the claims are indeed unconstitutional.

    Armed now with those particular documentations, the Plaintiff comes now argueing the following :

## Count 7:

      **Background** : During the month of March of 2023 the Plaintiff was being held at El Dorado Correctional Facility and was housed in one of the Restrictive Housing Units ( RHU). The Plaintiff's cellmate during this time was a notoneusly violent inmate named Alfonso Briscoe # 66034.

  On March 16, 2023 the officer's duty was to conduct showers for the Plaintiff's side of cellhouse . Before March 16th of 2023 the last time the Plaintiff and his cellmate were allowed to shower was three days prior .

Before the cellhouse officers made it to the Plaintiff's cell, the Plaintiff and his cellmate had agreed that Briscoe would leave to shower and the Plaintiff would stay in the cell and bathe out the sink, so he could prevent their property being destroyed or "lost" as a result of a lousy cell search.

  The officers conducting showers on March 16, 2023 were CS1 Shawn R. Chostain and COII Alexander Owens.

When CS1 Chostain came to take cell 151 to the showers ( cell 151 is the Plaintiff's living quarters) he looked inside and noticed that there was a sheet drapped on the Plaintiff's bed area. Because of the sheet drapped on the Plaintiff's bed area, CS1 Chastain deceided to take away shower privileges for not only the Plaintiff, but also inmate Briscoe who stood at the door dressed ready for showers.

As the officers bypassed the Plaintiff's cell and began to take out the inmates in the next cell, Inmate Briscoe became angry and yelled out for the officers to return so he could shower, for he had no infractions pertaining to his bed area.

When the officers didnt answer him, Briscoe turned to the Plaintiff and vehemently suggested he get [them] to come back so they could let him shower.

For several minutes the Plaintiff shouted out the door stating that it was an emergency, but CSI Chastain and COll Owens disregarded the tone of his pleas for help.

After a while COll Owens came to see what the Plaintiff needed and it was then that the Plaintiff tried to explain that they couldnt disallow his cellmate from showering behind something as minor as a sheet that was drapped on the bed of the Plaintiff. During that time, CSI Chastain came over to see what the fuss was about.

The Plaintiff's cellmate then began tell CSI Chastain that he wanted to shower, and that his right to shower couldnt be taken away for something the Plaintiff was accussed of doing.

Despite the sense of everything said to the officers, CSI Chastain said "no," and refused to let inmate Briscoe take a shower.

At that moment Inmate Briscoe grew livid and told the officers that if he couldnt shower he was going to fight the Plaintiff.

The Plaintiff grew nervous and began to fear for his safety after hearing that, so he went to the door and requested to be separated until they found another cell to put him in.

Both officers refused to separate the Plaintiff from his cellmate, despite the clear threat which was made by inmate Briscoe.

The Plaintiff again voiced reason to be separated, but CSI Chastain told him no, then looked at inmate Briscoe and said "your responsible for your own actions." And with a smirk he walked off and resumed showers.

A few minutes later, Inmate Briscoe was witnessed assaulting the Plaintiff up against the cell door. An emergency call was made on the radios and it was then that the Plaintiff and Inmate Briscoe was seperated.

The Plaintiff had a bleeding lip as he was accessed by the nurse and another officer also named Owens.

The Plaintiff was put back in cell 151 alone, and his property and legal mail was confiscated and held for approx. 5 days.

The next day the Plaintiff was given a disciplinary report for alledgedly fighting. See Exhibit Y1 However, the charge was dropped due to Inmate Briscoe admitting he was the aggressor, and that Plaintiff never fought back. See Exhibit Y

The Plaintiff filed a grievance on CSI Chastain and COll Owens about the incident and requested $150 worth of canteen items to rectify being assaulted, when the assault could have been prevented.

The grievance was denied behind false claims. See Exhibit Y3

The Plaintiff appealed the denial to the Kansas Department of Corrections' Secretary of Corrections, but that too received an errorenous denial of remedy. See Exhibit Y4

## Arguements, Authorities, and Liability of Defendants

The moment Inmate Briscoe threatened the Plaintiff with bodily harm, it was a duty of CSI Chastain or COll Owens to remove the Plaintiff from the risk of harm.

And its because they didnt, that[that] disregard of safety became a constitutional violation.

See Tafoya v. Salazar, 516 F. 3d 912, 916 (10th Cir 2008): " The Eighth Amendment's prohibition of cruel and punishment imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care and reasonable safety from serious bodily harm."

Due to the facts of this situation this court cannot say CSI Chastain and CoII Owens were not deliberately indifferent to the Plaintiff's right to remain safe from obvious risks of serious bodily harm.

See Farmer v. Brennan, 511 US 825, 834, 114 S. Ct 1970, 128 L. Ed 2d 811 (1994)

" the prison official must have a sufficiently culpable state of mind to violate the constitutional standard. The standard of culpability necessary to an Eighth Amendment violation is one of deliberate indifference ...

A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety."

CSI Chastain was the ~~august~~ supervising officer, on March 16th 2023 and was made aware of the threat the moment he heard Inmate Briscoe express it, toward the Plaintiff; and as the supervising officer CSI Chastain had an official duty to 1) remove the Plaintiff from the excessive risk which he created.

"He" being CSI Chastain, and 2) discipline Inmate Briscoe for the threat made to the Plaintiff, he did neither.

KAR 44-12-306 (Threatening or intimidating any person) is a regulation CSI Chastain is familiar with, and it partial states: "An inmate shall not threaten or intimidate, either directly or indirectly any person or organization."

Another prison regulation both Chastain and Owens should have been familiar with is the Kansas Department of Corrections Internal Management Policy and Procedure number 01-100D subsection of "Mission, Vision and Beliefs" ~~states~~ which states: "Our Vision ... Fostering dignity and safety by establishing practices and policies that honor individual differences with mutual dignity and respect and all feel safe and supported."

The disregard to the Plaintiff's safety by both of these Defendants was in contravention to the IMPP stated above.

This court must be advised, the Plaintiff's cellmate (Inmate Briscoe) was a documented gang member with a very violent prison record, who is serving a life sentence for murder; which are all reasons they should have took the necessary precautions to prevent Inmate Briscoe of making good his threat toward the Plaintiff.

There were isolated places within the unit the Plaintiff could have been placed, but the prison officials refused to entertain that option, despite the numerous pleas from the Plaintiff to do so.

The Tenth circuit has held clear admonishments toward the type of adverse actions CSI Chastain and CoII Owens effected the Plaintiff with, on March 16, 2023, see Harris ex rel. Harris v. Maynard, 843 F.2d 414, 416 (10th Cir 1988)

" Where one's very right to life is at stake and where prison officials control the conditions of confinement thereby reducing the prisoner's ability to protect himself, it takes no great acumen to determine that, constitutionally, prison officials may not exercise their responsibility with wanton or obdurate disregard for or deliberate indifference to the preservation of the life in their care ... The same is true under the Fourteenth Amendment due process clause ... We conclude that wanton or obdurate disregard of or deliberate indifference to the prisoner's right to life as a condition of confinement is a substantive constitutional deprivation whether it falls under the due process clause or the Eighth Amendment."

This case, isn't a claim of "excessive force", but it is a constitutional claim addressing "wanton disregard"... to a prisoner's safety. And it was because of that wanton disregard [this prisoner] was harmed.

Defendants CSI Chastain and CoII Owens are liable for the violation of the Plaintiff's Eighth Amendment rights. See Haley v. Gross, 86 F.3d 630

In the Haley case, Haley was awarded a very large ~~a~~ remedy for prison officials' wanton disregard to his safety.

Just like the Plaintiff, the officials were called to the cell and things were said which created awareness that if no care was implied, something harmful was going to occur. And just like in Haley v. Gross, the Plaintiff repeatedly requested to be moved away from his threatening cellmate.

The court in Haley v. Gross pointed out - " Thus Haley did not need to prove that any of the defendants intended that Wilborn harm him or that they actually believed that Wilborn would harm him. It is enough for Haley to show that the defendants actually knew of a substantial risk that Wilborn would seriously harm him." Wilborn was Haley's cellmate.

The Plaintiff didn't get severely burned as a result of these defendant's deliberate indifference, however, he did get harmed... and was effected pysically by that harm inflicted. See Exhibit Y2

The Plaintiff has successfully stated a claim of Deliberate Indifference.

## - Counts: Defendant ~~Weah~~ Isaiah J.O Barker

**Background:** On June 6th 2023 the Plaintiff was being held at EL Dorado Correctional Facility and was being housed in B cellhouse - one of the facility's Restrictive Housing Units. On this day at approx 3 pm the last meals prepared by Aramark were brought to the Plaintiff's cellhouse so each inmate could eat dinner. During that time the Plaintiff resided in cell 151 and was ~~snooze~~ snuggled inside his "sleep system" taking a nap.

As the Plaintiff slept he was passed up by the Defendant Isaiah J.O Barker, as col Barker passed out the dinner trays. As the Defendant then after begin to collect the dinner trays the Plaintiff awoke from the sound of him emptying food and garbage in the trashbin. ~~Correction: however no inmate noticing when Plaintiff was awakened by the Defendant.~~

The Plaintiff confronted the Defendant about his dinner tray, asking col Barker why he didnt get woke up so he could receive his supper. The Defendant Barker lied to the Plaintiff by alledging he attempted to wake the Plaintiff up but did not respond. The Defendant claimed he took the Plaintiff's silence as a refusal to eat his meal.

Upset, the Plaintiff seeked out the cellhouse supervisor CSI Thompson and stressed to him he was maliciously denied dinner by the Defendant Isaiah J.O. Barker. CSI Thompson didnt get the Plaintiff a dinner tray like the rest of the inmates, however he gave the Plaintiff a small bag of plain flavored chips, and a small brownie.

The Plaintiff did not receive any substantial protein or any minerals ~~from~~ from vegatables.

Upon information and belief the Defendant refused to feed the Plaintiff dinner because the Plaintiff had been previously disciplined for a battery against staff; and because so, the Plaintiff filed a timely grievance requesting to receive $100 in commissary as a form of remedy. But before he requested the commissary the Plaintiff simply requested to receive an extra meal on "Hamburger Saturdays" and on "Pancake Sundays".
**See Exhibit Z**

In his grievance, the Plaintiff specifically requested the "fact-finder" to ~~remew~~ review the security footage in B cellhouse during the time dinner was passed. The Plaintiff was adament the camera would show the opposite of what the Defendant Barker had alledged.

The fact-finder of the Plaintiff's grievance denied the grievance without reviewing the security footage.
**See Exhibit Z1.** The Plaintiff appealed the grievance to the Defendant Warden Tommy Williams; but it was denied.

The Defendant Jeremy Hoepner was the prison offical who acted as the fact-finder for the grievance CA22890.

The Plaintiff appealed the decision of Mr. Hoepner to the Secretary of Correction and his "designee".

In the Plaintiff's petition to the Secretary of Corrections, in regard to grievance CA22890, the Plaintiff warned them of legal trouble for them if they continued to disregard their obligation to review the camera for June 6th 2023.
**See Exhibit Z2 and Exhibit Z3**

Despite the warning of litigation through civil suits, the Secretary of Correction's Designee deined the grievance, and again ( the Kansas Department of Corrections) did so without properly investigating the complaint".

## Arguements, Authorities, and reason for Liability

" Failure to adhere to federal law, your state's administrative regulations and your agency's policies and procedures is evidence of malicious intent to violate our rights." Peli'v. Procunier 417 US 817 (1974)

On June 6th 2023 The Defendant Isaiah J.O Barker claimed he attempted to awake the Plaintiff during meal pass. He also stated that due to the Plaintiff being asleep and unresponsive he interpreated [that] to mean the Plaintiff did not desire to eat dinner. Even if that were true, Mr. Barker's actions did not reflect proper policy.

**See Exhibit ___** All officers working restrictive housing units are required to know to alert the shift's captain and medical whenever an inmate is unresponsive during meal pass. To carelessly assume they are sleeping peacefully with wishes to be undisturbed is against rules and regulations.

However the truth of the matter is that the Defendant Mr. Barker purposely passed up the Plaintiff during meal pass so the Plaintiff could suffer by hunger.

The Defendant Mr. Barker violated the Plaintiff's Eighth Amendment right by using false claims to deprive him of adequate food.

4.

See Clemmons v. Bohannon, 918 F.2d 858 (10th Cir 1990) (quoting Rhodes v. Chapman 452 US 337)

" A prisoner's conditions of confinement may constitute punishment prohibited by the Eighth Amendment unless such conditions ~~of confinement may constitute punishment prohibiting the~~ are "part of the penalty that criminal offenders pay for their offenses against society."

Being deprived of the prison's daily meals is not part of the penalty the Plaintiff was sentenced to endure. In fact, the Eighth Amendment prohibits such deprivations. Inmates of Occoquan v. Barry, 269 US App DC 210, 844 F.2d 828, 836-839 (DC Cir 1988) (" deprivations" that trigger eighth amendment scrutiny are deprivations of essential human needs --- food, shelter, health care, and personal safety.)

When Mr. Barker choose to deny the Plaintiff the opportunity to accept his dinner tray he ~~trigger~~ triggered an Eighth Amendment scrutiny by subjecting the Plaintiff to an ~~unes~~ Unusual and atypical hardship. Thus, proving that the Plaintiff has stated a claim under the Eighth Amendment.

- The Defendant Isaiah J.O Barker is also responsible for violating the Plaintiff's rights under the 14th Amendment.

    The Fourteenth Amendment to the Constitution guarantees everyone "equal protection of established laws"

    Equal protection means that a prison or a prison official aren't allowed to treat one or some prisoners differently than they treat other similarly situated prisoners.

    On June 6th 2023 the Plaintiff was similarly situated to the other inmates who resided in his cellhouse and ate the regular diet meals which came from the prison's Kitchen.

The Kansas Department of Corrections' IMPP # 20-101 A states: "Each resident is to receive the same quality and portion of food daily."

Because Mr. Barker worked for KDOC, he had a duty to oblige to this particular regulation of proper policy and procedure; yet, that is not what he did.

On June 6, 2023 every inmate on the Plaintiff's tier received an opportunity to receive their food, all except the Plaintiff... and the person responsible for that [was] the Defendant Isaiah J.O Barker. Thus, this Defendant can not escape from liability, in connection to the violation of the Equal Protection Clause under the 14th Amendment.


- Defendants Jeremy Hoepner, Tommy Williams, Darcie Holthaus, and Jeff Zmuda (and their liability for). -

    Each one of the Defendants listed above acted with a wanton disregard by refusing to "properly" investigate the Plaintiff's complaint against the corrections officer Mr. Barker.

The Defendant Jeremy Hoepner was the first prison official to be confronted with Grievance CA22890. See ~~Exhibit~~ Exhibit Z1

Considering the alledgation presented by the Plaintiff, Hoepner had a duty to act as an impartial fact finder in finding out whether or not COI Barker actually did deliberately deny the Plaintiff his last meal of the day. Hoepner did not act impartial; in fact his approach at locating the truth was quite prosecutorial, mainly because he deliberately refused to review the security footages, as the Plaintiff clearly had requested.

After Hoepner erroneously denied the Plaintiff's grievance, the Plaintiff appealed that ~~does~~ denial up to the Warden of EDCF, and the appeal, again, clearly requested For the Warden to simply review the cameras within B cellhouse from June 6th. Just like Hoepner, the Warden Tommy Williams had a duty to properly investigate the complaint by reviewing the security footage to see whether or not Mr. Barker's False accusations were true. And again, just like Hoepner... Williams deceided to take his officers word as being golden and denied the Plaintiff's complaint, without reviewing the security footage as the Plaintiff had clearly requested. See Exhibit Z5

The next Defendants who learned of the incident on 6th of June 2023, were Jeff Zmuda and his "designee" Darcie Holthaus. But not only did they learn of Mr. Barkers misconduct, they also were told about the Warden's and Hoepner's failure to review the security footages, in regard to grievance CA22890. See Exhibit Z2

The Plaintiff stated: " If the camera would have been reviewed, the fact-finder would have saw that COI Barker did not stop at my cell and open my food pass..."

The Plaintiff ended his appeal to the Secretary of Corrections by again requesting/demanding that "they" simply review the camera footage from June 6th 2023; but before he did that, the Plaintiff put the Secretary of Corrections on notice that civil actions would arise if another denial was issued (without first reviewing the camera)

Despite the policies and Procedures, and the logic of his request the Defendants chose to deny the Plaintiff any compensation. See Exhibit Z4.

"On appeal the inmate offers no evidence or argument that suggests that the response rendered by staff at the facility is wrong."

It was an unconstitutional error on the part of Darcie Holthaus and Jeff Zmuda to make such an assertion.

At that point, these two defendants had made it **obvious** that they intended to act with deliberate Indifference toward Exhibit Z2 and Exhibit Z, which absolutely did act as the Plaintiff's argument and also his attempt to establish the necessary **evidence**.

The result of these prosecutorial denials turns on whether the defendants conduct indeed did violate clearly established statutory or constitutional rights of which a reasonable person should have known.

(" Prison officials who are under a duty to investigate claims of computational errors in the calculation of prison sentences may be liable for their failure to do so when a reasonable request is made.") Alexander v. Perrill, 916 F. 2d 1392

This court must ~~confuse~~ [not] confuse the law. "Computational errors in the calculation of a prisoner's prison sentence 'are under the same umbrella as "failures to provide adequate food to prisoners," because both claims are matters protected by the Constitution; and if ever a claim of **either** arises the court in **Perrill** made it clear that a duty to completely investigate is always required... especially when reasonable request are made.

In this case the Plaintiff requested that the security footage be reviewed, and he did so during every phase of his attempts at administrative relief. That sort of request cannot be deemed unreasonable.

The Plaintiff's complaint no. CA22890 consisted of a "he say-she say" dilema. And considering the circumstance, the best ~~investigative~~ tool any of these defendants could've used was "their access to the security cameras."

By reviewing the cameras as the Plaintiff had repeatedly requested, one of these defendants would have saw that the correctional officer Barker was indeed lying and surely had acted with malice toward the Plaintiff, by bypassing his cell during meal pass.

The Defendant Darcie Holthaus mentioned nothing of reviewing their security cameras at El Dorado Correctional Facility, as a reason to deny the Plaintiff the compensation he seeked. She claimed to have spoken to an Unit team Manager by the name of "Lewis", and that according to this "Lewis character" staff tried to wake the Plaintiff; yet, there is no UTM named Lewis who is employeed at El Dorado Correctional Facility, let alone involved in the incident which occured on June 6th 2023 in any way; which makes the "conclusions made" in regard to grievance CA22890 extremely ambiguous.

The Secretary of Corrections had a duty to be aware of all of that, yet, not once did he intervene and order someone to review the security footage, as the Plaintiff requested.

It must be pointed out, that this sort of disregard to review security cameras when a prisoner asks prison officials to do so is considered a "tacit authorization", which silently permits other prison officials to deny an inmate their meal, for their actions went be seen on cameras.

That sort of tacit authorization is unconstitutional. See Nichols v. Md. Corr. Inst. 186 F. Supp. 2d 575 (quoting Slakan v. Porter, 737 F 2d. 368, 372 (4th Cir 1984) (" A supervisor may be liable if his aleged supervisory indifference **or** tacit authorization of subordinate misconduct is a causative factor in a persons constitutional injuries. It is correct that "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates")

The proper question this court should now entertain is whether these prison **officials** of supervisor status" acted wantonly, ~~ad~~ obdurately, or with deliberate Indifference to the fact there was possibly exculpatory evidence caught on camera, which would've shined light on which party was being truthful, out of the Plaintiff and COl Barker.

The Plaintiff believes he has shown the proof that these supervisors' corrective inaction amounted to a deliberate Indifference which cant be disregarded by a court of law. Thus, it should not be a problem to agree that Defendants Jeremy Hoepner, Tommy Williams, Darcie Holthaus, and Jeff Zmuda all violated the Plaintiffs 8th amendment right by their ~~refusal~~ act of refusing to review the security footage as the Plaintiff had requested.

## • Violations of the 14th Amendment

These Defendants' corrective inactions not only infringed upon the Plaintiff's 8th Amendment right, but also it trampled the Plaintiff's right to Due Process which is governed under the 14th Amendment of the Constitution.

A prisoner's effort at obtaining administrative relief requires Due process of law; because the fact finding process of a grievance is no different than the fact finding process of a prison's disciplinary hearing, and a disciplinary officer shares the same "duty to investigate" as each Defendant does - considering the circumstances.

Whenever a prisoner requests the prisons security camera as (a witness) a disciplinary officer or grievance officer has a duty to look into that prisoner's request; and a failure or refusal to do so constitutes a violation of that prisoner's procedural due process rights. See Walker v. Bates 23 F.3d 652

In Walker v. Bates the inmate requested several witnesses whose purpose was to corroborate the inmate's defense, and it was because that fact finder refused to call those witness, the court deemed his inactions unconstitutional.

The Plaintiff didnt request any other officers or another inmate as a witness, but he did request the security ~~footage~~ footage to act as his ~~corroborary~~ corroborating witness in regard to grievance No. CA22890.

If the Defendants would have did what the could by reviewing the camera (as the Plaintiff requested) the findings would have changed the outcome of those attempts at administrative relief and the Plaintiff could've been made whole, for the loss he suffered on June 6 2023, at the hands of Defendant Barker.

The law is simply established - a meaningful investigation was required before the Plaintiff's complaints were denied and his request for compensation refused.

The Plaintiff had a constitutional right to have that "request-for-review-of-camera" sought out/entertained, yet each one of the these supervisors employed by the KDOC choose to disregard the Plaintiff's right to procedural due Process, by wantonly refusing to review the security footages from June 6, 2023.

This court must agree, the Plaintiff's 14th Amendment right was violated by Defendant Jeremy Hoepner; Defendant Tommy Williams; Defendant Darcie Holthaus; and Defendant Jeff Zmuda~ through the therey of "Supervisory Liability".

## • Violation of the 1st Amendment    "Conspiracy-to-cover up" claim

This first Amendment claim consist of an argument of a "conspiracy-to-cover-up."

Each prison official of supervisor status is connected to this conspiracy to cover up claim. Specifically speaking, the liability within this claim must fall on Defendants Jeremy Hoepner, Tommy Williams, Darcie Holthaus, and of course the Secretary of Corrections Jeff Zmuda. See Vasquez v. Hernandez. 60 F.3d 325, 329 (7th Cir 1995) ("stating that the 'cornerstone' to a First Amendment right-of-access claim is 'that the conspiracy had prevented a full and open disclosure of facts crucial to the cause of action, rendering hollow the Plaintiffs right of access and that the claim is not actionable where the cover-up failed to achieve such ends."

If the Plaintiffs case wasnt deemed actionable in the Hernandez proceeding, this Plaintiff's case surely is.

The cover-up tactics in this case didnt fail to achieve such ends, as it obviously did in Vasquez v. Hernandez.

The Plaintiff requested that the KDOC review the security footage during each phase of his effort at administrative relief. Again. See Exhibits Z2 and Exhibit Z

Each reasonable request made by the Plaintiff was disregarded; and it was those wanton disregards which became the main ingredients to the conspiracy at hand here in this claim.

7.

See Orwat v. Maloney. 360 F. Supp 2d 146 ("To ~~est~~ establish a cognizable "cover-up" claim, Orwat must establish not only the cover up, but also ~~that~~ the cover-up succeeded.")

See also Gonsalves v. City of New Bedford, 939 F. Supp 921, 926 (D. Mass 1996) : "Stating that cover-up is only actionable if a defendant succeeded in preventing a claimant from discovering or proving a violation of his constitutional rights."

When the Plaintiff filed grievance no. CA22890 he requested that the Defendant Jeremy Hoepner reviewing the camera within his cellhouse, during the time COI Barker distributed the evening meals.

The purpose of the Plaintiff's request was to help the fact-finder discover that COI Barker indeed did deliberately deny the Plaintiff an opportunity to eat dinner.

That discovery, from the security footage, would have proved the Plaintiff's assertions correct - that COI Barker did violate his federal rights by unlawfully denying him a meal, then lying about it in order to cover-up his actions.

When grievance no. CA22890 was denied by the defendant Jeremy Hoepner, the next prison official who decided the complaint was the Warden of El Dorado Correctional Facility (Defendant Tommy Williams)

Again, the Plaintiff requested for KDOC to look at the cameras from June 6th 2023, for it would show that COI Barker was not telling the truth. See Exhibit Z1 (then) Exhibit Z5

The Defendant-Warden Williams, denied grievance CA22890 without reviewing the cameras, yet stated: "Appropiate steps have been taken to ensure the process has been properly taken." The Plaintiff, scoffs at that notion.

The Defendant-Warden Tommy Williams had the opportunity to establish key facts by reviewing the security footage, yet he choose not to do so, and it was that action which prevented the Plaintiff from discovering and proving the violation of federal rights which occured against the Plaintiff on June 6th 2023.

The Defendants Darcie Holthaus and Jeff Zmuda acted ~~and~~ no different than their subordinates; cause they too wantonly disregarded their duty to review the camera from June 6, 2023, despite the Plaintiff's stern request for them to do so.

Accordingly, the Plaintiff not only requested for them to review the cameras but warned them of a civil suit if they once again choose not to. See Exhibit Z2

"Failure to give me what I am entitled to or anything less than what I have requested shall subject you (the Secretary of Corrections) to be held liable in a lawsuit for condoning such behavior which effected my health on June 6, 2023."

The Plaintiff went on further and ended his "arguments" with another request for [them] to do their job correctly. stating:
"In closing I highly recommend this department review the camera footage from June 6 2023 so you can see what I am saying is the truth."

The Defendants Darcie Holthaus and Jeff Zmuda denied grievance no. CA22890 without reviewing the cameras, and as a result their corrective inaction prevented the Plaintiff from discovering proof that a ~~viol~~ violation of his constitutional rights occured on June 6, 2023.

With regard to Gonsalves v City of New Bedford, the Plaintiff has satisfied the requirments to show his First Amendment right was violated by Defendants Jeremy Hoepner, Tommy Williams, Darcie Holthaus and Jeff Zmuda.

Each defendant impeded the Plaintiff's ability to "effectively" access the court here in the District of Kansas, because the Plaintiff has come arguing a Eighth violation committed by COI Barker - however, was robbed of the right to obtain the exculpatory evidence needed to show good cause.

See Bounds v. Smith, 430 US 817, 822. 52 L. Ed 2d. 72, 97 S Ct 1491, 1495 (1977) "Under the First Amendment individuals have a right of access to the courts which must be adequate, effective, and meaningful."

Issue #9

Liability of the Kansas Department of Corrections

Using the claim of "Vicarious-liability", the Plaintiff desires to impliment this governmental entity into this 1983 Bivens complaint, as a standing 'Defendant', so it can provide indemnification for the adverse actions committed by its employees over the coarse of two years.

According to certain state and federal laws, this court can allow KDOC itself to be sued for damages. See Spurlock v. Townes. 661 Fed. Appx 536 (10th Cir)

In Spurlock v. Townes the Plaintiffs were permitted to sue the prison employees for their misconduct and the penal corporation those prison officials were employeed by ... which was CCA - "Corrections Corporation of America."

In Kansas, there is state law which makes companies such as the Department of Corrections strictly liable for the "tortious conduct" of their employees. See K.S.A §75-6103-

"Liability of governmental entities for damages caused by employee acts or omissions, when; applicable procedure."

a.) Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state.

K.S.A 75-5201 (The Purpose and Construction) applys mainly to the Kansas Department of Corrections, and clearly establishes the following standards : "The legislative purpose in enacting this act shall be deemed to be establishment of policy of treatment of persons convicted of felonies in this state by placing maximum emphasis on rehabilitation of each such person while in the custody of the state or under the jurisdiction of the courts of the state, consistent with the interests and safety of the public, so that a maximum of persons so convicted may be returned to private life in the communities of the state with improved work habits; education, mental and physical health and attitudes necessary to become and remain useful and self-reliant citizens. It is the intent of the legislature that judges, the secretary of corrections, his or her agents, subordinates and employees and the Kansas adult authority, its agents, subordinates and employees will construe and apply this act and acts of which it is amendatory or supplemental liberally to rehabilitate, train, treat, educate and prepare persons convicted of felony in this state for reentry or reentry into the social and economic system of the community upon leaving the custody of these state agencies and officers."

According to the facts within this 1983 Bivens complaint, the civil wrongs which were committed against the Plaintiff, over a coarse of two years, were not conducive to the Plaintiff's improved education, mental health, physical well being, and neither his attitude ; and because so, the Kansas Department of Corrections can not dodge liability.

See Howard v. Adkison. 887 F. 2d 134 ("A single incident, or a series of isolated incidents, usually provides an insufficient basis upon which to assign supervisory liability. However, as the number of incidents grow, and a pattern begins to emerge a finding of tacit authorization or reckless disregard becomes more plausible.")

Moreover, and lastly, KDOC [itself] can not hold the entitlement to plead "good faith" as a defense to liability.

With all said the Plaintiff request the Kansas Department of Correction (as an entity) to be included into this complaint so they can be sued in their individual capacities ... an action pursuant to Spurlock v. Townes 661 Fed Appx 536 (10th Cir)

EDCF
PO Box 311
EL Dorado, Kansas 67042


quadient
FIRST-CLASS MAIL
IMI
$002.31 ⁰
10/01/2024 ZIP 67042
043M31240048
US POSTAGE

United States Court of Appeals
For The Tenth Circuit
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257

Scanned by
US Marshal

Legal matter